UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANNE DUNN and ANTHONY DUNN,
as representatives of the ESTATE of SAM DUNN,
        Plaintiffs,


        v.                                        CIVIL ACTION NO. 18-10581-MPK[1]


PATRICK BARRY and JOHN NGUYEN,
in their individual capacities,
        Defendants.


MEMORANDUM AND ORDER
ON DEFENDANTS PATRICK BARRY AND JOHN NGUYEN'S
MOTION FOR SUMMARY JUDGMENT PURSUANT TO [F.]R.C.P. 56(c) (#77).


KELLEY, U.S.M.J.


I. Introduction.

        On March 27, 2018, plaintiffs Anne Dunn and Anthony Dunn, joint personal

representatives of the estate of their son, Sam Dunn, filed a two-count complaint against

defendants Patrick Barry and John Nguyen, both corrections officers of the Essex County Sheriff's

Department. Plaintiffs allege claims under 42 U.S.C. § 1983 for violation of Sam Nunn's right to

adequate medical care under the Due Process Clause of the Fourteenth Amendment (Count I), and

wrongful death under state law, Massachusetts General Laws chapter 223 § 2 (Count II).

---

[1] With the parties' consent, this case was reassigned to the undersigned for all purposes, including
trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (##10, 12.)

II. <u>The Facts</u>.

The applicable standard is familiar: "On defendants' motion for summary judgment, we read the facts in the light most favorable to the plaintiff." *Irish v. Fowler*, 979 F.3d 65, 68 (1st Cir. 2020), *pet. for cert. pending* (No. 20-1392) (citing *Stamps v. Town of Framingham*, 813 F.3d 27, 30 (1st Cir. 2016)). The following facts are undisputed unless otherwise noted.

On January 3, 2016, Sam Dunn was admitted to Anna Jaques Hospital for evaluation of erratic behavior, substance abuse, and suicidal ideation. (#79, Statement of Undisputed Material Facts, ¶ 1; #83, Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts, ¶ 1; #84, Plaintiff's Statement of Facts ¶ 1.)[2] Hospital records reflect that he was "yelling and pacing," "upset with self," and "yelling at self" during his three-day hospital stay. (#79 ¶ 2; #83 ¶ 2.) On or about January 6, 2016, Sam Dunn's mother and his girlfriend, Aisha Khalid, visited him at the hospital. (#79 ¶ 3; #83 ¶ 3.) Ms. Khalid was observed by hospital security giving a bag containing drug paraphernalia, including syringes, to Mr. Dunn. *Id.* Hospital security confiscated the materials, and Ms. Khalid was asked to leave. *Id.*

Mr. Dunn was thereafter observed in the bathroom ingesting what was determined to be opioids contained in fingers cut from a surgical glove. (#79 ¶¶ 4, 5; #83 ¶¶ 4, 5.) Mr. Dunn became quite violent when hospital security and staff tried to make him spit out the drugs and required six people to restrain him. (#79 ¶ 6; #83 ¶ 6.) When asked by hospital staff, Mr. Dunn did not unequivocally deny swallowing foreign materials. (#79 ¶ 7; #83 ¶ 7.)  He agreed to a rectal examination during which no foreign bodies were found. (#79 ¶ 8; #83 ¶ 8.) Following the rectal

---

[2] Plaintiffs have filed a Statement of Facts (#84) to which the defendants did not specifically respond, although defendants have filed a Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (#89) with exhibits (##89-1 through 89-5).

exam, Mr. Dunn became more agitated and belligerent. (#79 ¶ 9; #83 ¶ 9.)[3] In light of his erratic behavior, Anna Jaques Hospital requested an involuntary commitment for substance abuse treatment for Mr. Dunn at the Newburyport District Court pursuant to Massachusetts General Laws chapter 123 § 35. (#79 ¶ 10; #83 ¶ 10; #84 ¶ 2.)

On January 6, 2016, Mr. Dunn was transported by the police from Anna Jaques Hospital to the Newburyport District Court, where the court issued an Order of Commitment directing that Mr. Dunn be civilly committed to MASAC (Massachusetts Alcohol and Substance Abuse Center) in Bridgewater for substance abuse treatment. (#79 ¶¶ 11-12; #83 ¶¶ 11-12; #84 ¶ 2.) Defendants Patrick Barry and John Nguyen, corrections officers assigned to the Transportation Unit of the Essex County Sheriff's Department (ECSD), picked up Mr. Dunn shortly after 4:00 PM at the Newburyport District Courthouse and transported him to the Essex County Correctional Facility (ECCF).[4] (#79 ¶¶ 13-14; #83 ¶¶ 13-14; #84 ¶ 3.) Officers Barry and Nguyen understood that it was their job as transportation officers to ensure the safety of the people they were transporting. (#84 ¶ 3.)  Officer Barry observed Mr. Dunn to be possibly under the influence of some type of drug or alcohol; he stated in a State Police interview that Mr. Dunn "seemed out of it, dazed, like, he looked like he was under the influence of something." (#79 ¶ 15; #83 ¶ 15; #84 ¶ 5; #86-5 at 3.[5]) Officer Barry stated that "when I saw [Mr. Dunn's] condition at the court, I took it upon myself

---

[3] The statements in paragraphs 1, 3, 6, 7, 8, and 9 of defendants' undisputed material facts (#79) are admitted with the caveat that there is no evidence that defendants were aware of these facts. (#83 ¶¶ 1, 3, 6, 7, 8, 9.)

[4] At times, the parties refer the Essex County Sheriff's Department and the Essex County Correctional Facility interchangeably.

[5] The page number refers to the ECF numbering.

to make sure he was separate, because I didn't know if he was detoxing, if he was gonna throw up, and I didn't want him with other inmates and throwing up on them." (#84 ¶ 8; #86-5 at 14-15.)

At no time during his transport did Mr. Dunn inform Officers Barry and Nguyen that he had consumed any illegal drugs such as the ingested opioids contained in fingers cut from a surgical glove. (#79 ¶ 16; #83 ¶ 16.) Officers Barry and Nguyen were never told by any Newburyport District Court official, Newburyport Police Department personnel, or employees from Anna Jaques Hospital that Mr. Dunn had ingested illegal opioids or was under the influence of any medication. (#79 ¶ 17; #83 ¶ 17.) Mr. Dunn was known to Officer Barry[6] as a repeat offender who had been in and out of ECCF in Middleton, Massachusetts. (#79 ¶ 18; #83 ¶ 18; #84 ¶ 6.) Officers Barry and Nguyen were aware that Mr. Dunn had been civilly committed by the court to obtain drug abuse treatment. (#84 ¶ 4.)

The way Mr. Dunn acted at Newburyport District Court and at ECCF was consistent with the way he had acted during his prior incarcerations at ECCF. (#79 ¶ 19; #83 ¶ 19; *but see* #84 ¶ 6; #86-2 at 12-13 (Officer Barry testified that Mr. Dunn's behavior at the Newburyport District Courthouse was not the same as it had been in 2007 when Officer Barry supervised him because Mr. Dunn "seemed like he may have been under the influence of some type of substance.")[7] Mr. Dunn was brought into the ECCF holding area for later transport to MASAC; he spent about 90

---

[6] Officer Nguyen knew that Mr. Dunn was a prior offender but was uncertain if he had previously seen Mr. Dunn or had any interaction with him. (#83 ¶ 19; #84 ¶ 7.)

[7] Defendants included the way Mr. Dunn had acted at Anna Jaques Hospital in this statement, which plaintiffs denied. (#79 ¶ 19; #83 ¶ 19.) Plaintiffs also claim that the statement is incomplete because "[f]ormer Superintendent Marks testified when Mr. Dunn behaved this way, he would be placed in the 'risk room' in the infirmary, a single cell with a camera so correctional officers could monitor him 24/7." (#83 ¶ 19.)

minutes in the holding cell.[8] (#79 ¶ 20; #83 ¶ 20.) At ECCF, Officer Nguyen observed that Mr.

Dunn was "wobbly, unsteady on his feet," and, having seen that, thought that it "might be a good

idea to have him evaluated by someone with more medical knowledge" than he had. (#84 ¶ 9; #86-

1 at 54-55.) Medical staff was available immediately outside the intake door at ECCF, but Officer

Nguyen did not have Mr. Dunn medically evaluated. (#84 ¶ 11; #86-1 at 55.) At no time while he

was in the ECCF holding cell did Mr. Dunn tell Officers Barry or Nguyen that he had ingested

illegal opioids. (#79 ¶ 21; #83 ¶ 21.)[9]

At about 6:30 PM, Mr. Dunn was led to the transportation van by Officers Barry and

Nguyen; while walking to the van he did not tell them that he ever ingested illegal opioids. (#79 ¶

22; #83 ¶ 22.) Defendants claim that Mr. Dunn "was alert and conscious when he got into the van";

plaintiffs admit that he was conscious, but deny that he was alert, asserting instead that Mr. Dunn

appeared to be under the influence and needed assistance getting into the van. (#79 ¶ 22; #83 ¶ 22;

#86-1 at 21-22.) At his deposition, Officer Nguyen agreed that as a transport officer, if he observed

someone in need of medical attention, he was obligated to try to get medical attention for that

individual. (#86-1 at 21.) Officer Nguyen also agreed that based upon what he had observed of

Mr. Dunn at ECCF,[10] Mr. Dunn should have been evaluated medically before being transported.

*Id.* The ECSD policy regarding general requirements for the transport of inmates states, in part,

"[p]rior to accepting custody of an inmate, transportation staff shall determine . . . that the inmate

---

[8] Videos of various pertinent events have been submitted, including a clip of Officer Nguyen and
Mr. Dunn arriving at ECCF. (#84 ¶ 9.)

[9] Defendants state that Mr. Dunn never told anyone at ECSD that he had ingested illegal opioids,
but plaintiffs counter that the reports do not include such a statement. (#79 ¶ 21; #83 ¶ 21.)

[10] There are video clips of Officer Nguyen assisting Mr. Dunn when he had trouble sitting down
on a bench and as he stumbled at ECCF. (#84 ¶ 13.)

is not in need of immediate medical attention." (#86-3 at 2 ¶ 209.06.) Mr. Dunn was not medically evaluated prior to leaving ECCF. (#86-1 at 18, 21.)

Andy W. Guillon was transported with Mr. Dunn in the van from ECCF to MCI Cedar-Junction. (#86-8 at 2-4.) According to Mr. Guillon, while walking to the van, Mr. Dunn was screaming that he did not want to move, he did not want to go, he was sick and did not feel well. *Id.* at 3-4. Mr. Guillon had observed Mr. Dunn from the time he was in the holding cell at ECCF and thought that he actually was sick based on "[h]is movement. He's not walking. He's crumbling over. His speech is slurred. He just looked, like dope sick." *Id*. at 8. Mr. Guillon wanted to be separated from Mr. Dunn in the van "because [Mr. Dunn] looked sick and he's going to throw up on" Mr. Guillon. *Id.* at 4, 13. Mr. Guillon testified Mr. Dunn had asked to be put in the front cage of the van because he was sick, but that the officers would not allow it.[11] (#86-5 at 4; #86-6 at 4-5.) The officers assisted Mr. Dunn into the van because "he seemed out of it" and "[h]e looked unsteady." (#84 ¶ 24; #86-5 at 4-5.) Mr. Dunn was placed in a locked compartment inside the van and another prisoner [Mr. Guillon] was placed in a separate locked compartment adjacent to Mr. Dunn in the van. (#79 ¶ 23; #83 ¶ 23.)

During the transport, the officers could hear Mr. Dunn and Mr. Guillon in the back of the van. (#86-1 at 25-27.) Mr. Guillon heard Mr. Dunn repeatedly tell the officers that he was sick.

---

[11] As noted, Officer Barry placed Mr. Dunn had been in the front compartment on the transport from Newburyport District Court to ECCF because of Mr. Dunn's "condition" and Officer Barry's uncertainty as to whether he was "detoxing." Former Superintendent Marks agreed that "if a person who was being transported appeared to be sick [then] it would be best practice to put that person in one of the front cages where they could be observed by the passenger in the transportation vehicle" and he would expect his transportation officers to know that practice. (#82-2 at 15.) Officer Nguyen agreed that if Mr. Dunn had been placed the front compartment directly behind him on the transport to MASAC, it would have been easier for Office Nguyen to keep him under observation. (#86-1 at 23-24; *see also* #86-2 at 7 (Officer Barry testified that the assisting officer in the transport van would be able to observe the person in the individual front compartment right behind the passenger seat but was unsure if people in the back compartments could be seen)).

(#86-8 at 8, 14.) According to Mr. Guillon, for the first twenty minutes of the trip, "it looked like [Mr. Dunn] was throwing himself from side to side. I hear, thump, thump, thump, thump, thump. Obnoxiously banging, 'CO, please, I'm sick. Please.' Constantly kept saying, 'I'm sick.' 'I'm sick.' 'I'm sick.'" *Id*. at 14. After twenty minutes, Mr. Guillon heard no noises or snoring from Mr. Dunn. *Id.* at 12.

The van first stopped at MCI-Cedar Junction on the way to MASAC, and during that time both Officers Barry and Nguyen heard loud snoring noises coming from Mr. Dunn. (#79 ¶ 24; #83 ¶ 24; #84 ¶ 28.)[12] The snoring noises were so loud that they could be heard over the music on the radio and the highway traffic; Officer Nguyen testified that he "had never heard anything like it." *Id.* Mr. Guillon exited the van at MCI-Cedar Junction and Bernard Grant entered the van. (#84 ¶ 29.) Mr. Grant was put in the rear right cage where Mr. Guillon had been. (#86-1 at 73.) Mr. Grant could not see Mr. Dunn, but he could hear him: "I heard strange gasping sounds coming from [Mr. Dunn's] cage. I was annoyed by the loud sound. It sounded like snoring followed by gasping for air. I tried to get Mr. Dunn to wake up and stop snoring by kicking the metal divider with my leg. He did not respond to the sounds." (#86-23 ¶ 3.) In an affidavit, Mr. Grant stated: "At one point I yelled to the correctional officers saying 'Yo, yo, CO, we got to get him [Mr. Dunn] out of here. There is something wrong with dude here.' I told them he was fighting for breath. The guards yelled back telling me that I should mind my own business." *Id.* ¶ 4.

Officers Barry and Nguyen arrived at MASAC in Bridgewater in the ECSD transportation van with their transportees shortly after 9:00 PM. (#79 ¶ 25; #83 ¶ 25; 86-15 ¶ 3.) Throughout the

---

[12] It is undisputed that snoring can be the result of sleep apnea, and that a snoring person can be assumed to be a living, breathing body. (#79 ¶ 24; #83 ¶ 24.)

ride from MCI-Cedar Junction to MASAC, the officers could hear the snoring noises from Mr. Dunn. *Id*.

Due to a lockdown at the facility, Mr. Dunn was unable to be admitted immediately into MASAC, but had to stay in the ECSD transportation van parked outside of the facility. (#79 ¶ 26; #83 ¶ 26; #84 ¶ 31.)[13] For approximately three hours and thirty minutes while they were in the van waiting at MASAC,[14] Officers Barry and Nguyen could hear Mr. Dunn snoring. (#79 ¶ 27; #83 ¶ 27.) The ECSD Transportation Policy provides that "the assisting officer shall sit in the front seat, but in such a way as to maintain constant visual observation of the inmate(s)." (#86-3 at 3, ¶ 209.06; *see also id*. at 4 ¶ 209.08 ("The assisting officer(s) shall be responsible for the following: . . . [t]o maintain continual visual observation of inmate(s)"); #86-4, ECSD Post Assignment for Transportation Officer, Post Order #045 at 3-4 (same).)  Officer Nguyen, the assisting officer, testified that while they were in the MASAC parking lot, he did not have Mr. Dunn under constant observation. (#86-1 at 42.)[15] The ECSD Transportation Policy further provides that "[s]taff shall always be within sight and sound of a restrained inmate to recognize breathing difficulties or loss of consciousness. In this regard staff shall be alert to issues as obesity, alcohol and drug use, or

---

[13] Plaintiffs note that Officers Barry and Nguyen could have requested medical care from MASAC staff for their transportees while waiting for admission into the facility. (#83 ¶ 26; #84 ¶ 32.)

[14] Former Superintendent Marks testified that, although there was no policy or procedure in place at this time of this incident, if a transportation van was waiting in a parking lot for between three and four hours, he would expect the transportation officers to use their common sense which would have dictated that they get out of the van and "inspect everyone in the vehicle every 15 minutes." (#86-22 at 9.) That inspection would include looking at the individuals been transported, asking them if they were okay or if they needed anything, and confirming the individuals were "living [and] breathing." *Id*. at 9-10.

[15] According to Officer Nguyen, if the doors of the van were closed while they were waiting in the parking lot, it was "pretty much impossible to see like the full figure" of the person in the rear cage behind the driver. (#86-1 at 12.)

psychotic behavior." (#86-3 at 7, ¶ 209.11; #86-4, ECSD Post Assignment for Transportation Officer, Post Order #045 at 5 (same).)[16]

At one point during the time they were waiting in the parking lot, Officer Nguyen escorted another transportee [Mr. Grant] from the van to use the MASAC bathroom. (#79 ¶ 28; #83 ¶ 28.) When Officer Nguyen opened the back door of the van to get Mr. Grant, the compartment light came on so he could see Mr. Dunn through the small window of the metal cage, but he did not open the compartment door to check on Mr. Dunn. (#86-1 at 2-4, 39-40.) At that time, Mr. Dunn was seated, leaning his head forward and snoring. (#86-1 at 3.) En route to the bathroom, Mr. Grant says that he told Officer Nguyen, "Dude [Mr. Dunn] sounds like he's dying back there." (#86-23 ¶ 6.) Officer Nguyen could hear Mr. Dunn snoring while he was in the van and when he was removing the other transportee, but not while he was outside of the van. (#83 ¶ 28.) Defendants state that Mr. Dunn continued to make loud snoring noises and they believed him to be simply asleep and not in need of any medical attention; plaintiffs deny this statement. (#79 ¶ 29; #83 ¶ 29.)

Officers Barry and Nguyen did not open the door to the rear compartment where Mr. Dunn was being held until 10 to 15 minutes after they noticed that Mr. Dunn had stopped snoring. (#86-1 at 2-4, 39-40; #86-2 at 21.) According to Officer Barry, it was "[l]ike 10, 15 minutes" when he realized that the snoring had stopped and that he should go and check on Mr. Dunn. (#86-5 at 13.)[17] At his deposition, Officer Barry agreed with the statement that "[i]t would have been

_____

[16] Officers Barry and Nguyen were aware of the ECSD Transportation Policy and the Post Order and, in fact, were required to read and sign off on the post orders annually. (#86-1 at 6; #86-22 at 13.)

[17] Defendants contend that "the longest possible period of time that Barry and Nguyen no longer heard the decedent snoring was four minutes – between 12:49 am when Barry re-entered the van, and 12:53 am when he exited the van to check on the decedent." (#89 at 2.) This argument is

inappropriate to wait ten or 15 minutes after you noticed him stop snoring to go check on him,

right?" (#86-2 at 3.)[18] Mr. Grant stated in his affidavit:

> At some point I noticed that Mr. Dunn was not making any sounds. It was quiet in the van. I yelled to the officers, "Dude ain't snoring no more!" About fifteen minutes passed with no response. Then one of the officers opened the rear doors. When the door on Mr. Dunn's side was finally opened wide, I could smell the strong odor of vomit.
>
> *****
>
> The correctional officers did not do anything to Mr. Dunn while I was in the van. They did not check on him or speak to him until he stopped snoring. The only time they opened the door to his cage after I was placed in the van was 10 to 15 minutes after he stopped snoring. After the officer open the door, the officer asked Mr. Dunn if he was okay but there was no response.

(#86-23 ¶¶ 8, 11.)

Surveillance video of the MASAC parking lot shows that at about 12:41 A.M.,[19] Officer

Barry exited the van, paced around the side of van, and then walked around the back of the van,

apparently on the telephone. (#86-15 ¶ 3.) Officer Barry spoke to Officer Nguyen at the passenger

---

contrary to their own testimony and statement. *See* #86-5 at 13; #89-3 at 2-3*; see also* #86-23 ¶ 11.

[18] Michael Marks, the Superintendent of ECCF at the time of the events at issue, testified as follows:

> Q. Would that be consistent with the policies and practices of the Essex County Correctional Facility to wait ten or 15 minutes after the snoring stopped to check on the prisoner?
> A. No.
> Q. Why not?
> A. They were no longer in sight or sound.
> Q. So what should the officer have done at that point?
> A. They should have checked the inmate.

(#86-22 at 16.)

[19] There were surveillance cameras at MASAC that recorded the ECSD van while it was in the parking lot on January 6-7, 2016. (#86-15 ¶ 1.) The surveillance video was timestamped. *Id.* ¶ 2.

side window at 12:42 A.M. and again at 12:43 A.M. *Id.* Officer Barry remained outside the van for about 8 minutes before he returned to his seat in the van at 12:49 A.M. *Id.* [20] At approximately 12:53 A.M., Officer Barry checked on Mr. Dunn,[21] found him to be non-responsive and called for MASAC emergency responders. (#79 ¶ 30; #83 ¶ 30; #84 ¶ 48.)[22] Mr. Dunn was on his knees on the floor of the compartment, slouched over. (#86-2 at 21.) Officer Barry saw that Mr. Dunn had vomited; Officer Nguyen had not heard Mr. Dunn vomit. (#86-1 at 43; #86-2 at 21.) According to defendants, checking on an inmate whom an officer can no longer hear snoring should be done every 10-15 minutes. (#79 ¶ 31.) Plaintiffs disagree, citing testimony to the effect that once the officers did not hear snoring, they should have checked on Mr. Dunn without waiting. (#83 ¶ 31; #84 ¶¶ 91, 92.) Mr. Dunn's cause of death was acute opiate intoxication. (#79 ¶ 32; #83 ¶ 32.)

There is expert testimony stating that "[i]f Mr. Dunn had been administered naloxone (Narcan)[23] at any time after he ingested the opiate, essentially up until he stopped snoring in the back of the transport van while it was parked at MASAC, he would have immediately awoken and regained consciousness, and would have survived." (#86-19 at 5.)

---

[20] Officer Nguyen's testimony is equivocal. He first testified that Mr. Dunn was snoring the whole time that Officer Barry was out of the van, but then stated that he could not remember if the snoring stopped while he was in the van and Officer Barry was outside. Officer Nguyen did agree that it was 10 to 15 minutes after the snoring stopped before Officer Barry went to the rear of the van and opened the compartment where Mr. Dunn was located. (#89-3 at 2-3.)

[21] Prior to this point, Officer Barry and Officer Nguyen had not opened the rear compartment door and physically checked on Mr. Dunn for approximately six hours. (#84 ¶ 63.)

[22] Plaintiffs clarify this statement by stating that Officer Barry only checked on Mr. Dunn at least 12 minutes after he had stopped snoring. (#83 ¶ 30; *see also* Defendants' Reply, #89 at 2 ("That '10-15' minute period actually is a 12-minute period.").)

[23] Narcan was available at both ECCF and MASAC. (#86-20 at 4; #86-22 at 2.)

III. <u>Summary Judgment Standard</u>.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Federal Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (internal citation and quotations marks omitted).   "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate "if the record is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014).

The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citation omitted).  A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (internal citation and quotations marks omitted).   "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation*." Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal citation and quotation marks omitted).

In determining whether summary judgment is proper, the court must view the record in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  Rule 56 "mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  "'Where the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*,

550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586-87 (1986) (further internal quotation marks omitted)).

IV. <u>Discussion</u>.

"Government officials sued in their individual capacities are immune from damages claims

unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their

conduct was clearly established at the time." *Irish*, 979 F.3d at 76 (internal citations and quotation

marks omitted); *Stamps*, 813 F.3d at 33-34. Defendants here claim to be entitled to the protection

afforded by the doctrine of qualified immunity. The First Circuit has explained the applicable

standard:

> When a defendant invokes qualified immunity, an inquiring court typically engages
> in a two-step pavane. First, the court must determine whether the plaintiff's version
> of the facts makes out a violation of a protected right. Second, the court must
> determine whether the right at issue was clearly established at the time of
> defendant's alleged misconduct. The second step itself has two sub-parts. Sub-part
> one requires the plaintiff to identify either controlling authority or a consensus of
> cases of pervasive authority sufficient to signal to a reasonable [official] that
> particular conduct would violate a constitutional right. Sub-part two requires us to
> consider whether a reasonable [official] in the defendant's position would have
> known that his conduct violated the established rule. These inquiries are carried out
> with the understanding that qualified immunity is meant to shield all but the plainly
> incompetent or those who knowingly violate the law.

*Norton v. Rodrigues*, 955 F.3d 176, 184 (1st Cir. 2020) (internal citations and quotation marks

omitted); *McCue v. City of Bangor, Maine*, 838 F.3d 55, 63 (1st Cir. 2016); *Marrero-Mendez v.*

*Calixto-Rodriguez*, 830 F.3d 38, 43 (1st Cir. 2016); *Miranda-Rivera v. Toleda-Davila*, 813 F.3d

64, 72 (1st Cir. 2016); *Stamps*, 813 F.3d at 34. "If either of the two prongs is not met - i.e., if the facts do not show a constitutional violation or the right in question was not clearly established - the officer is immune. Either prong may be addressed first, depending on the circumstances in the particular case at hand." *Marrero-Mendez*, 830 F.3d at 43 (internal citation and quotation marks omitted).

Plaintiffs contend that Officers Barry and Nguyen violated Mr. Dunn's right to adequate medical care under the Due Process Clause of the Fourteenth Amendment. Defendants allegedly were aware of, or willfully blind to, Mr. Dunn's serious medical need and the substantial risks of harm it posed but acted with deliberate indifference in failing to secure prompt medical attention.[24] "It is clearly established . . . that jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees. To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Penn v. Escorsio*, 764 F.3d 102, 110 (1st Cir. 2014) (internal citations and quotation marks omitted); *Savino v. Souza*, 459 F. Supp.3d 317, 328 (D. Mass. 2020) (*quoting Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011) (further citations omitted) ("The barebones

---

[24] "The Eighth Amendment's proscription of cruel and unusual punishments is violated by deliberate indifference to serious medical needs of prisoners. . . . [When plaintiff is not a convicted prisoner] the relevant constitutional provision is not the Eighth Amendment but is, instead, the Due Process Clause of the Fourteenth Amendment." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983) (internal citation and quotation marks omitted). The duty to provide medical care to a civilly committed person under the due process clause would "extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990); *Miranda-Rivera*, 813 F.3d at 74; *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, 460 F. Supp.3d 132, 145 (D.N.H. 2020) ("The duties owed under the Due Process Clause to those who are detained civilly are <u>at least as</u> extensive as those owed under the Eighth Amendment to convicted inmates.") (emphasis in original).

constitutional demand on the government is 'to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health.'"). The Supreme Court has instructed that "[t]he 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *D.C. v. Wesby*, - U.S. -, 138 S.Ct. 577, 590 (2018) (internal citation and quotation marks omitted); *see also Ziglar v. Abbasi*, - U.S. -, 137 S.Ct. 1843, 1867 (2017) (internal citation and quotation marks omitted) ("a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted.").

The First Circuit has recognized that "[t]here are both objective and subjective components" to such claims. "The objective component requires the plaintiff to prove that []he has a medical need 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018) (*quoting Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc) (further citation omitted)); *Leite v. Bergeron*, 911 F.3d 47, 52 (1st Cir. 2018). "The serious medical need inquiry is fact-specific and must be tailored to the specific circumstances of the case." *Abernathy v. Anderson*, 984 F.3d 1, 6 (1st Cir. 2020) (internal citations and quotation marks omitted).

The record shows that Mr. Dunn was hospitalized for evaluation of, among other things, substance abuse, and that three days later the hospital sought to have him involuntarily committed under state law for substance abuse treatment. Mr. Dunn was taken to the Newburyport District

Court, where a judge issued an Order of Commitment[25] pursuant to Massachusetts General Laws chapter 123 § 35, directing that Mr. Dunn be civilly committed to MASAC for ninety days for substance abuse treatment. Officers Barry and Nguyen knew about the commitment order and the reason for it.

It is undisputed that Officers Barry and Nguyen were never told that Mr. Dunn had ingested opioids. However, based on his observations at the Newburyport District Court, Officer Barry thought that Mr. Dunn might be under the influence of drugs and possibly detoxing. Based on his observations of Mr. Dunn at ECCF, Officer Nguyen believed that Mr. Dunn should have had a medical evaluation before being placed back in the transport van.

Each of the two prisoners who were transported with Mr. Dunn, Mr. Guillon from ECCF to MCI Cedar Junction and Mr. Grant from MCI Cedar Junction to MASAC, observed Mr. Dunn's medical condition and expressed concerns about it to Officers Barry and Nguyen. Mr. Guillon described Mr. Dunn as having slurred speech, being "dope sick," and "look[ing] sick [like] he's going to throw up." Because of Mr. Dunn's condition, Mr. Guillon did not want to be positioned near him in the transport van, and Officer Barry complied with his request.[26] Mr. Grant described "strange gasping sounds coming from [Mr. Dunn's] cage" that "sounded like snoring followed by gasping for air." Mr. Dunn did not respond to Mr. Grant kicking the metal divider between the compartments to try to wake up. Mr. Grant stated that he yelled to Officers Barry and Nguyen:

---

[25] The Order recites that Mr. Dunn had been examined "by a qualified physician or psychologist" and, "based on competent medical testimony," the court determined Mr. Dunn had "a substance use disorder" and "that failure to commit [Mr. Dunn] would create a likelihood of serious harm." (#79-2.)

[26] According to Mr. Guillon, putting transportees on opposite sides of the van was not the norm because "[u]sually they will not separate just two people. We'd be on the same side." (#86-8 at 13-14.)

"'Yo, yo, CO, we got to get him [Mr. Dunn] out of here. There is something wrong with dude here.' I told them he was fighting for breath."[27] According to Mr. Grant, there is no doubt that the officers heard him: they responded by yelling at Mr. Grant to mind his own business. At a later point, while being escorted to the bathroom at MASAC, Mr. Grant told Officer Nguyen that Mr. Dunn "sounds like he's dying back there."

Viewing the facts in the light most favorable to plaintiffs, based on the medical determination underlying the Order of Commitment, the officers' observations and the lay witnesses' testimony, there is sufficient evidence upon which a reasonable jury could find that Mr. Dunn had a serious medical need that required a doctor's attention. It could be found that the concerns articulated by the lay observers, i.e., Mr. Dunn was dope sick, unresponsive and gasping for air, constituted the actual risk of harm he faced: according to expert testimony, the opiate drug Mr. Dunn had swallowed "gradually absorbed into his blood stream over approximately the next 11 hours, until the blood level became so high that Mr. Dunn stopped breathing, and then died." (#86-19 at 5.)[28] Coupled with ensuing discussion on the subjective inquiry,[29] plaintiffs have adduced sufficient facts that, if credited by a jury, would establish the objective component of their claim.

Next,

---

[27] Defendants contend that "no witness described decedent's snoring to be unusual." (#89 at 2.) Mr. Grant's description that he heard Mr. Dunn making "strange gasping noises," "snoring followed by gasping for air," and that "he was fighting for breath" is contrary to that assertion.

[28] "The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment." *Abernathy*, 984 F.3d at 6 (internal citations and quotation marks omitted).

[29] The First Circuit has recognized that "the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination; [s]imilar evidence, including evidence of adverse effects, may be relevant to both components." *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 498 (1st Cir. 2011) (internal citations and quotation marks omitted).

> The subjective component [of a deliberate indifference to a medical need claim] requires the plaintiff to show that prison officials, in treating the plaintiff's medical needs, possessed a sufficiently culpable state of mind. That state of mind is one that amounts to deliberate indifference to the claimant's health or safety.
>
> *****
>
> To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable and yet failed to take the steps that would have easily prevented that harm.

*Zingg*, 907 F.3d at 635 (internal citations and quotation marks omitted); *Irish*, 979 F.3d at 74 (internal citation and quotation marks omitted) ("To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk of serious harm . . . and disregarded that risk."). "[D]eliberate indifference entails something more than mere negligence, but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. This standard, requiring an actual, subjective appreciation of risk,[30] has been likened to the standard for determining criminal recklessness." *Leite*, 911 F.3d at 53 (internal citations and quotation marks omitted); *Coscia*, 659 F.3d at 39 (internal citations omitted) ("Proof of deliberate indifference requires a showing of greater culpability than negligence but less than a purpose to do harm and it may consist of showing a conscious failure to provide medical services where they would be reasonably appropriate."); *Savino*, 459 F. Supp.3d at 328.[31]

---

[30] "A factfinder can conclude that a government official was aware of a substantial risk of serious harm based on the fact that the risk was obvious." *Miranda-Rivera*, 813 F.3d at 74 (citation omitted).

[31] The parties disagree on the proper standard to be applied in a medical care case: the stricter Eighth Amendment "deliberate indifference" standard or the "objectively unreasonable" standard articulated in *Kingsley v. Hendrickson*, 576 U.S. 389, 396-400 (2015), an excessive force case. The First Circuit has yet to weigh in on the debate. The court need not resolve the issue since plaintiffs' claim passes muster at this juncture, depending how the facts are ultimately determined, under either standard.

When Officers Barry and Nguyen picked Mr. Dunn up at the Newburyport District Court at about 4:00 PM on January 6, 2016, they received a copy of the Order of Commitment so they knew, or became aware, that he had been civilly committed to obtain drug abuse treatment. Neither officer was told by any official or Mr. Dunn himself that he had ingested drugs. However, knowing the basis for the civil commitment, i.e., substance abuse, Officer Barry stated that, at the Newburyport District Court, Mr. Dunn "seemed out of it, dazed, like, he looked like he was under the influence of something." In light of his condition, Officer Barry opted to put Mr. Dunn in a front compartment in the transport van because Officer Barry did not know "if he was detoxing, if he was gonna throw up."

At ECCF, Officer Nguyen observed that Mr. Dunn was wobbly and unsteady on his feet. He had difficulty sitting down on a bench and needed assistance. ECSD policy requires that transportation officers determine that a transportee does not need immediate medical attention before accepting that individual for transport.[32] Based on his observations, Officer Nguyen thought Mr. Dunn should have been medically evaluated at ECCF and was obligated to try to get him medical attention, yet no medical evaluation was undertaken. Although conscious, Mr. Dunn stumbled on the way out to the van to be transported from ECCF to MASAC and needed help getting into the van.

Taking the facts in the light most favorable to plaintiffs, a reasonable jury could find that Officers Barry and Nguyen knew from the time they picked him up in Newburyport that Mr. Dunn had a substance abuse problem and that he appeared to be under the influence of drugs, wobbly

---

[32] "A defendant's adherence to proper police procedure bears on all prongs of the qualified immunity analysis." *Irish*, 979 F.3d at 77 (citation omitted).

and unwell. At least Officer Nguyen believed Mr. Dunn needed medical attention but did nothing
to have a medical evaluation done.

When Mr. Dunn was led out of ECCF to the van, about two and a half hours had passed
since he been picked up in Newburyport, but he still "seemed out of it" and "looked unsteady."
According to Mr. Guillon, Mr. Dunn was screaming that he did not want to go and that he was
sick. Mr. Guillon believed he was, in fact, sick based on his observations: Mr. Dunn was slurring
his words, he appeared dope sick, and he looked like he was going to vomit. While Officer Barry
had deemed it prudent to place Mr. Dunn in the front compartment when leaving the Newburyport
District Court because "he looked like he was under the influence of something," Officer Barry
refused to put Mr. Dunn there when leaving ECCF, instead putting him in a back compartment
where it was difficult for him to be visually observed as required by ECSD policy and the best
practices described by Superintendent Marks. Officer Barry did, however, accede to Mr. Guillon's
request that he and Mr. Dunn not be placed on the same side of the van because Mr. Dunn looked
sick; usually, two transportees would not be separated.[33] Mr. Dunn continued to tell the officers
that he was sick for at least the first twenty minutes of the ride to MCI Cedar-Junction, but then
stopped communicating and is never reported to have spoken another word for the hours that he
was in the transport van.

A reasonable jury could find that Officers Barry and Nguyen knew that Mr. Dunn had a
substance abuse problem, was not well and probably detoxing, yet put him in a back compartment
in the transport van where he could not be fully observed visually and never once opened the door
to that compartment to check on him for about six hours. Defendants argue that, because they

---

[33] A reasonable jury could infer that Officer Barry placed Messrs. Guillon and Dunn in different
compartments on opposite sides of the van because he, too, believed Mr. Dunn looked sick.

could hear him snoring, they thought he was just sleeping. This contention is too simplistic and fails to take into account additional factors a reasonable jury may consider. For example, Mr. Dunn's snoring noises have been described as so loud that they could be heard over radio and highway noise; Officer Nguyen testified that he "had never heard anything like it." Further, if the jury credits Mr. Grant's testimony, it could be found that the officers ignored his warnings that Mr. Dunn was not merely snoring, but gasping for breath and struggling to breath, the very concerns addressed in an ECSD policy and Post Order. Further, Mr. Dunn, although snoring, had stopped communicating and had not responded to the metal wall of his compartment being kicked. A reasonable jury could find that had the officers used their common sense, in Superintendent Marks' words, they would have checked on Mr. Dunn every fifteen minutes while waiting in the parking lot at MASAC and perhaps would have heard the gasping, or determined that he was unresponsive, or noticed that he was slumped on the floor, or seen that he had vomited. A reasonable jury could find that Officer Barry waited at least ten to twelve minutes before checking on Mr. Dunn after he stopped snoring. According to Superintendent Marks, that delay was inconsistent with ECSD policies and practices: Mr. Dunn's situation should have been investigated immediately. Considering the record evidence as a whole, there is an adequate factual predicate from which willful blindness or a level of criminal negligence could reasonably be inferred.

Defendants cite numerous cases for the proposition that "a pre-trial detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need or an officer's deliberate indifference to a substantial risk of serious harm to a detainee." (#79 at 9, reviewing cases.) But the relevant inquiries are fact intensive, and each of those cases can be distinguished.[34]

---

[34] The factual distinctions between the case at hand and those upon which defendants rely are evident. For example, *Rogers v. City of Winnsboro, Texas*, 15-cv-003-MHS-KNM, 2016 WL 8730189, at *8 (E.D. Tex. July 8, 2016), *report and recommendation adopted*, 2016 WL 8709828

Viewing the record in plaintiffs' favor here, there are sufficient facts from which a reasonable jury could find that this is not a case of mere intoxication, but that there is "more." At a minimum a reasonable jury could find that, knowing Mr. Dunn was sick and being warned that he was struggling to breathe, Officers Barry and Nguyen basically chose to ignore him, leaving him in a back compartment of the transport van where he could not be visually observed and without checking him for hours in contravention of ECSD policies and practices.

V. <u>Conclusion and Order</u>.

With factual issues precluding the entry of judgment as a matter of law on the question of qualified immunity, Defendants Patrick Barry and John Nguyen's Motion for Summary Judgment Pursuant to [F.]R.C.P. 56(c) (#77) is DENIED.

May 17, 2021

/s/ M. PAGE KELLEY
M. Page Kelley
Chief United States Magistrate Judge

---

(E.D. Tex. Aug. 19, 2016), plaintiff denied having any serious medical conditions and the officers, one of whom had medical training, never observed any behavior that caused them to believe plaintiff was suffering from a medical condition requiring treatment. After transporting plaintiff to jail, an officer checked on him hourly until his shift ended. Here, while Mr. Dunn never told Officers Barry and Nguyen that he had ingested opioids, both officers knew that he had been civilly committed for substance abuse treatment, both officers observed behavior indicating that he was sick, and, apart from looking at Mr. Dunn once through a window in the metal compartment door in the van, did not visually observe him or check on him for a span of hours.

Similarly, in *Parrish v. Cleveland*, 372 F.3d 294, 308-309 (4th Cir. 2004), officers in fact took measures with regard to the intoxicated decedent, deciding to transport him to the detention center where he would receive medical treatment, having his head injury evaluated by an EMT before transporting him, and, in consultation with an EMT, positioning him in the van with the intention of preventing aspiration on vomit, albeit an effort that ultimately proved unsuccessful. Here, Officers Barry and Nguyen never had Mr. Dunn medically evaluated before accepting him for transport from ECCF, although Officer Nguyen thought he should have been, or while waiting in the MASAC parking lot until a certain time after Mr. Dunn stopped snoring.